IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.   NO. 4:24-CR-71

DENNIS COLEMAN

**OPINION AND ORDER**

Following his indictment for possession with intent to distribute methamphetamine, Dennis Coleman moves to suppress his clothes and their contents, including "blue pills," removed from him while he was in a hospital emergency room being treated for gunshot wounds. The government contends suppression is inappropriate because the nurses who removed and searched Coleman's clothes were not government agents. Because the Court concludes that the nurses who removed and searched Coleman's clothes were private actors, suppression will be denied.

**I
Procedural History**

On June 25, 2024, a federal grand jury returned a one-count Indictment charging Dennis Coleman with possessing with intent to distribute a mixture and substance containing a detectable amount of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C). Doc. #1 at PageID 1. On September 22, 2024, Coleman filed a "Motion to Suppress Any and All Items Seized and Searched as a Result of Defendant's Hospitalization." Doc. #25. The government responded in opposition to the motion on October 3, 2024. Doc. #27. Coleman did not reply.

On December 4, 2024, pursuant to notice, the Court held an evidentiary hearing on the motion to suppress. Docs. #33, #34. At the conclusion of the hearing, the Court took the motion under advisement. Doc. #34.

## II
## Standard

"The party seeking suppression has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Beaudion*, 979 F.3d 1092, 1102 (5th Cir. 2020). When a warrantless search or seizure is challenged, the government bears the burden of establishing the validity of the search or seizure by a preponderance of the evidence. *United States v. Conlan*, 786 F.3d 380, 387 (5th Cir. 2015); *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). But when a defendant seeks to suppress evidence on the ground that a search was conducted by a private party acting as a government agent, the defendant bears the burden to establish such by a preponderance of the evidence. *United States v. Meals*, 21 F.4th 903, 907 (5th Cir. 2021).

## III
## Hearing Evidence

During the evidentiary hearing,[1] the government called two witnesses—Brianna Walker and Nakia Hall—and introduced one exhibit; and Coleman called one witness—Montrellli Finley. Docs. #35, #36, #37.

### A. Hall's Testimony

On May 6, 2023, Bolivar County Deputy Sheriff Nakia Hall received a call at approximately 2:38 a.m. that there had been a shooting at a club in Winstonville and that the victim was being transported to the hospital in a personal vehicle. Hall went to the Bolivar County Medical Center to contact the victim as well as for crowd control because normally when a shooting victim comes to the hospital, crowds follow. Shortly after Hall arrived at the hospital,

---

[1] The Federal Rules of Evidence "do not operate with full force" at suppression hearings. *United States v. Matlock*, 415 U.S. 164, 172–73 (1974).

one of the victims of the shooting, Tytrice Thomas, pulled into the patient unloading area and was taken into the hospital to an emergency treatment room. A minute or two later, a vehicle pulled into the patient unloading area at a high rate of speed, and the driver, Kenaan Bady, told Hall he had a gunshot victim in the back seat of the car, Dennis Coleman.[2] After Hall helped get Coleman out of the car, Coleman was taken into the hospital by hospital personnel. During that time, the driver informed Hall that Coleman was a victim of the Winstonville shooting. Hall immediately went into the emergency room's treatment area to try to speak with both victims.[3]

Thomas was able to speak, unlike Coleman whose speech was unintelligible. Hall went back and forth between Thomas' room and Coleman's room where they each were receiving emergency treatment for their gunshot wounds. During the second time Hall spoke with Thomas, Hall asked Thomas what happened and Thomas replied that Coleman shot her. Hall then turned on the recorder on his cell phone and asked Thomas the same question and Thomas again stated that Coleman shot her.

The first time Hall was in Coleman's room, which was right down the hall from Thomas' room, he stayed a minute or two but did not remove anything from Coleman and, though Coleman was conscious, was not able to get anything about what happened from Coleman because Coleman's speech was unintelligible. Hall asked Coleman who shot him; however, Coleman did not provide an answer or say anything.

While Hall was in Thomas' room the second time, hospital staff came and asked him to come to Coleman's room. When Hall entered Coleman's room after being summoned by hospital

---

[2] Hall has known Bady thirty years or longer. He also knew Coleman.

[3] Hall asked Bady to remain on the scene to speak with investigators when they arrived. Hall did not direct Bady to go into the hospital and provide Coleman's personal information to the hospital. And Hall did not tell the hospital Coleman's name nor did hospital staff ask him Coleman's name.

staff, he observed hospital staff assisting Coleman with his breathing, and also pulling blue pills, money, car keys, and what he believed to be marijuana from Coleman's pants pocket and putting them down between Coleman's feet at the foot of the bed.[4] Hall collected the items at the foot of the bed and turned them over to Chief Investigator Chris McCain when Cain arrived to the emergency room. Hall did not have a search warrant for the items, did not collect Coleman's clothes, and did not ask hospital staff to turn over Coleman's clothes to him.

### B. Walker's Testimony

Brianna Walker is an emergency room nurse at Bolivar Medical Hospital in Cleveland, Mississippi. Walker was working at the hospital on May 6, 2023,[5] when Coleman was brought in a personal vehicle to the hospital's emergency room with severe, life-threatening gunshot wounds to his left jaw and his neck.[6] Coleman was conscious and could communicate but when Walker asked him for his name and birth date, Coleman said only, "I can't breathe." Unable to get Coleman's name, birth date, and other information to put into the hospital system, Walker, who was the assistant nurse, and Deanne Haynes, the primary nurse, started Coleman on oxygen and began to undress Coleman to look for other wounds and search Coleman's pockets for identification. According to Walker, obtaining Coleman's identification was for his safety and the nurses treating him, and to help determine his medical information, including any prior visits and if he is allergic to anything. In the front pockets of Coleman's pants, which were then still on his person, the nurses found and removed a wad of cash, blue powdery pills, and what looked like marijuana.[7] Walker then called an officer to come into the room. After the officers came to the

---

[4] Hall confirmed Exhibit G-1 depicted the items he saw taken from Coleman's pockets.
[5] Walker has worked in the hospital's emergency room for two years.
[6] Walker could see Coleman's teeth and it looked almost like his jawbone was broken.
[7] Walker recognized the items as what is depicted in Exhibit G-1.

4

room,[8] she gave everything removed from Coleman's pockets to them. Coleman was subsequently transferred to Jackson due to his condition.

With gunshot wound victims, it is hospital protocol to search patients for identification, even if they are conscious and able to speak, because sometimes they are in distress or pain and sometimes choose not to provide information—medical records are usually stored by a patient's birth date. And it is hospital policy to look for additional wounds beyond what is first visible by removing a patient's clothing. Walker searched Coleman pursuant to hospital protocol and policy, though she could not specifically name the policies which required her to remove Coleman's clothing or search his pockets. She did not call to see if Coleman's information had already been provided to the hospital because at that moment she was concerned with Coleman's medical treatment. And Walker did not ask Coleman for permission to remove the contents of his pockets or to give law enforcement the items removed from his pockets. No law enforcement officer searched Coleman's clothes, no law enforcement officer suggested or asked her to search Coleman's pockets, and the officers did not show her a search warrant.

### C. Finley's Testimony

Montrelli Finley is Coleman's brother. Early in the morning of May 6, 2023, he was notified that Coleman was at the hospital and drove to the hospital, arriving around 2 a.m. When he got to Coleman's room, Coleman was not able to communicate with him and he noticed law enforcement officers in the room. He was not aware anything had been taken from Coleman.

### IV
### Analysis

In his motion seeking to suppress his clothing and the items in his pants pocket while he

---

[8] While the items were being removed from Coleman's pants, Walker does not recall an officer being present in the room. Once an officer came into the room, Walker believes he then went to get the investigator.

5

was at the hospital, Coleman submits that because he had a constitutionally protected possessory interest and reasonable expectation of privacy in his clothes, their search and seizure without his consent and without a warrant violated the Fourth Amendment. Doc. #25 at 1–2. In its response opposing suppression, the government contends no Fourth Amendment violation occurred because the hospital staff were private parties and not government agents.

### A. Private Search Doctrine

The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. U.S. Const. Amend. IV. The government cannot use private individuals as agents to circumvent the protections of the Fourth Amendment. *Coolidge v. N.H.*, 403 U.S. 443, 487–88 (1971); *United States v. Cordova-Espinoza*, 49 F.4th 964, 968 (5th Cir. 2022). However, "[u]nder the private search doctrine, the Fourth Amendment is not implicated where the government does not conduct the search itself, but only receives and utilizes information uncovered by a search conducted by a private party." *United States v. Reddick*, 900 F.3d 636, 637 (5th Cir. 2018). As the Fifth Circuit recently explained:

> Under the private search doctrine, when a private actor finds evidence of criminal conduct after searching someone else's person, house, papers, and effects without a warrant, the government can use the evidence, privacy expectations notwithstanding. In other words, if a non-government entity violates a person's privacy, finds evidence of a crime, and turns over the evidence to the government, the evidence can be used to obtain warrants or to prosecute. The rationale for this doctrine is obvious. The Fourth Amendment restrains the government, not private citizens.

*Meals*, 21 F.4th at 906 (internal citations omitted). Still, if the defendant shows either the private actor "was actually an agent or instrument of the government when the search was conducted" or the government "exceeds the scope of the private actor's original search and thus discovers new evidence that it was not substantially certain to discover, the private search doctrine does not apply to the new evidence." *Id*. at 907.

6

### B. Government Agent Theory

In *United States v. Bazan*, 807 F.2d 1200 (5th Cir. 1986), the Fifth Circuit utilized the government agent theory to decide whether a private party's actions triggered the protections of the Fourth Amendment. Here, the government submits that *Bazan* "adopted a two-prong test from the Ninth Circuit [opinion in *United States v. Miller*] to determine whether a private party has acted as a government agent."[9] Doc. #27 at 4. But it is unclear to the Court what specific criteria or factors *Bazan* actually adopted. *See Bazan*, 807 F.2d at 1202–03 ("Appellants' arguments that Garza must be regarded as an agent of the government is based on an analysis propounded by the Ninth Circuit."); *but see id.* at 1204 ("[W]e hold that where the government has offered no form of compensation to an informant, did not initiate the idea that he would conduct a search, and lacked specific knowledge that the informant intended a search, the informant does not act as a government agent when he enters another's property."). The Fifth Circuit recently acknowledged this ambiguity and elected not to resolve which set of factors—the Ninth Circuit's two-prong test or *Bazan*'s three-prong test—should be used in the Fifth Circuit. *United States v. Cordova-Espinoza*, 49 F.4th 964, 968–69 (5th Cir. 2022) ("We thus do not decide here whether the three factors in *Bazan* are a test separate from the two-factor *Miller* test; similarly, we decline to opine on which of these two suggested approaches should control in future cases in this circuit."). This Court elects not to do so as well since under either test, the Court concludes that the hospital's staff were not government agents.

### 1. Application of *Miller* test

In *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982), the Ninth Circuit held that

---

[9] The government lists "[t]he two critical factors a[s] (1) whether the government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement or to further his own ends." Doc. #27 at 4.

7

the two critical factors in assessing whether a private party is an instrument or agent of the government are (1) whether the government knew of or acquiesced in the intrusive conduct, and (2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends.

Here, there is no evidence indicating Hall or anyone with the Bolivar County Sheriff's Department knew or acquiesced to the nurses removing Coleman's clothes or searching Coleman's pockets. Rather, the evidence shows Hall was not made aware of the contents of Coleman's pockets until after he was called to Coleman's room and after the nurses' search had been conducted. *See Miller*, 688 F.2d at 657 ("[D]e minimis or incidental contacts between the citizen and law enforcement agents … will not be subject to Fourth Amendment scrutiny."). Further, the nurses searched Coleman's clothes to locate identification information and removed his clothing to look for potentially hidden wounds, consistent with hospital protocol and policy of treating patients with gunshot wounds. *See United States v. Hudson*, 86 F.4th 806, 813–14 (7th Cir. 2023) (whether medical staff were correct about medical necessity of their conduct is not determinative but whether they acted pursuant to legitimate, independent medical purpose as opposed to desire to assist law enforcement); *see also United States v. Lamar*, 545 F.2d 488, 490 (5th Cir. 1977) (airline employee was acting in usual and ordinary course of his customary duties when he searched defendant's bag for identification and address purposes yet found evidence of crime later provided to police); *United States v. Clay*, No. 5:06-83, 2006 U.S. Dist. LEXIS 58061, at *4–5 (E.D. Ky. Aug. 17, 2006) (nurse's discovery of drugs was not in furtherance of assisting law enforcement since search of defendant's clothing was pursuant to hospital procedure to log and inventory personal items and protect hospital from accusations of theft). And though Walker could not precisely identify or name such policy, her motive remained a legitimate purpose independent

from assisting law enforcement. Under the Ninth Circuit's *Miller* test, the Court concludes the hospital staff were not government agents.

### 2. Application of *Bazan* test

Applying *Bazan*'s three prongs, the Court reaches the same conclusion. There is no evidence the nurses were offered compensation to search Coleman's clothes, no evidence Hall or anyone with the Sheriff's Department knew about the search, and no evidence Hall or anyone with the Sheriff's Department knew the nurses intended to search Coleman or knew what was in Coleman's pockets until after the nurses retrieved the items they found there. So the Court concludes the nurses were not government agents under *Bazan*'s test too.

### 3. Fifth Circuit's *Neely* opinion

Regardless, *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003)—which Coleman cites and argues is analogous to this case in that a "permanent seizure" of his property occurred which cannot be done without a warrant or proof an exception to the warrant requirement[10]—is easily distinguishable.[11] While Neely was at the hospital in the trauma unit being treated for a gunshot wound, the nurses removed, inventoried, and placed his clothing in a bag and then placed the bag in a storeroom at the back of the unit. *Neely*, 345 F.3d at 368. A law enforcement officer, believing Neely's clothing contained evidence relevant to a bank robbery investigation, went to the hospital and had the hospital give him the bag with Neely's clothes, while Neely was in surgery. *Id*. Law enforcement's lab analysis of Neely's clothes revealed evidence consistent with the bank robbery.

---

[10] Doc. #25 at 2 (citing *Neely*, 345 F.3d at 369–70, and arguing, "Because [defendant] never voluntarily abandoned either his clothing or other effects, he had no reason to believe that his belongings would be turned over to police without authorization … the [hospital] staff cannot consent to the search or seizure of the effects.").

[11] In his motion, Coleman also cites and quotes the Mississippi Supreme Court's 1999 opinion in *Floyd v. City of Crystal Springs* and the United States Supreme Court 1969 opinion in *Davis v. Mississippi* but only for the general undisputed principles that the Fourth Amendment protects a person's right to be secure from unreasonable searches and seizures, and that under the exclusionary rule, illegally seized evidence is inadmissible at trial. Doc. #25 at 2–3.

*Id*. The district court denied Neely's motion to suppress, "concluding that Neely had no reasonable expectation of privacy in his clothes while they were in the hospital's possession, since he voluntarily submitted himself to medical treatment wearing the bloody clothes." *Id.* at 369. On appeal by Neely, the Fifth Circuit reversed and remanded, holding that "Neely did not forfeit his possessory interest in his clothing by entering The Med and that the officers presumptively violated his Fourth Amendment rights in retrieving the clothes from the hospital." *Id.* at 370.

*Neely* did not discuss the subject of private action triggering Fourth Amendment protections because, unlike here, no private actor searched Neely's clothes. And Coleman does not explain how *Neely* applies to the private search doctrine or the government agent theory.[12] All Coleman did at the hearing is emphasize that Walker could not identify the specific policy or training which motivated her to search his pockets. Notably, Coleman does not dispute the nurses' motivation in searching his pockets.[13] Nor does Coleman dispute that law enforcement did not search his pockets or request that the nurses search his pockets. In short, *Neely* is not determinative of the present suppression issue.

### 4. Summary

Having concluded that the hospital's nursing staff were private parties and not government agents, the Court also concludes that Coleman fails to meet his burden to show the items recovered from his pockets should be suppressed. So Coleman's motion to suppress will be denied, and under the private search doctrine, the government is not precluded from using the evidence obtained from Coleman's pockets.

---

[12] At the hearing, Coleman also argued that the nurse's decision to summon Hall into his room to hand over the retrieved items transformed the nurse into government agents for Fourth Amendment purposes. However, he could cite no case law supporting such.

[13] Since *Miller*'s test inquires whether the private actor conducted the search to assist law enforcement, the existence of such a policy is irrelevant to the mental state of the private actor. *Hudson*, 86 F.4th at 813–14.

## V
## Conclusion

Coleman's "Motion to Suppress Any and All Items Seized and Searched as a Result of Defendant's Hospitalization" [25] is **DENIED**.

**SO ORDERED**, this 2nd day of January, 2025.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**
